# In the United States Court of Federal Claims

No. 18-531
(Filed Under Seal: July 2, 2026)
(Reissued: July 20, 2026)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MALINDA GIBBONS,                      \*

                              \*

           Petitioner,              \*

                              \*

        v.                      \*

                              \*

SECRETARY OF HEALTH AND HUMAN  \*

SERVICES,                     \*

                              \*

          Respondent.          \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Richard Gage*, Richard Gage, P.C., Cheyenne, WY, counsel for Petitioner.

*Debra A. Filteau Begley*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Respondent.

**OPINION AND ORDER**

**DIETZ, Judge.**

Petitioner Malinda Gibbons seeks review of Special Master ("SM") Christian J. Moran's decision denying her petition for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 *et seq.* ("Vaccine Act"). She alleges that she developed Guillain-Barré Syndrome-Miller Fisher Variant ("GBS-MFV") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine she received on April 19, 2016. Because Ms. Gibbons has not demonstrated that the SM's decision was arbitrary, capricious, an abuse of discretion, or not in accordance with law, the Court **DENIES** her petition and **SUSTAINS** the SM's decision.

## I.    BACKGROUND[2]

Ms. Gibbons was born in 1969. *Gibbons*, 2025 WL 4481312, at \*1. In January of 2013, she sought treatment from her gynecologist "for a bulge in her vagina, pelvic pressure, urinary

---

[1] Pursuant to Vaccine Rule 18(b) of the Rules of the United States Court of Federal Claims, the Court issued this Opinion and Order under seal on July 2, 2026, and provided the parties fourteen days to propose redactions. *See* [ECF 176]. The parties did not propose any redactions. Accordingly, the Court reissues this Opinion and Order without redactions.

[2] The factual background is derived from the SM's decision. *See Gibbons v. Sec'y of Health & Hum. Servs.*, 2025 WL 4481312 (Fed. Cl. Dec. 10, 2025).

frequency and urgency, and incontinence." *Id.* At the time, her gynecologist diagnosed "her as having a mild cystourethrocele," or "protrusion of the bladder and urethra into the vagina." *Id.* One year later, in January of 2014, Ms. Gibbons emailed her primary care physician ("PCP"), complaining of "numbness and tingling in [her] neck and chin" over a period of several days. *Id.* (internal quotation marks omitted) (alteration in original). At an in-person appointment with her PCP later that month, she "stated that these symptoms were aggravated by stress and alleviated by a hot bath." *Gibbons*, 2025 WL 4481312, at *1. In March of 2014, Ms. Gibbons went to another doctor regarding "her three-month history of tingling along her neck and into her face." *Id.* at *2. She underwent a cervical x-ray, which showed that she suffered from "mild degenerative disease." *Id.*

Ms. Gibbons returned to her PCP on April 19, 2016, complaining of "chronic and progressively worsening urinary urgency and frequency." *Gibbons*, 2025 WL 4481312, at *2 (internal quotation marks omitted). At that appointment, she received a prescription for overactive bladder medication and the Tdap vaccine that is the subject of the instant petition. *Id.* In the weeks following her receipt of the Tdap vaccine, "Ms. Gibbons continued to complain about and seek medical attention for her bladder problems." *Id.* On May 15, 2016, she called her PCP and described her symptoms as follows: "tingling all over body . . . . Yesterday developed gum tingling, now legs, feet, scalp tingling. Unsteady feeling." *Id.* (internal quotation marks omitted). The next day, May 16, 2016, Ms. Gibbons had an appointment with a urologist, who "stated that she had urinary retention of unclear etiology." *Gibbons*, 2025 WL 4481312, at *2. On May 17, 2016, "Ms. Gibbons sought care in an emergency room [("ER")] due to numbness throughout her body and vertigo." *Id.* Upon examination, she was found to have "reduced sensation in her upper extremities," and bulging "tympanic membranes." *Id.* "[S]he was diagnosed with a bilateral ear infection, prescribed antibiotics, and released." *Id.* One day later, "Ms. Gibbons reported a two-day history of vertigo [triggered by eye movements] and difficulty walking." *Id.* After testing, "[s]he was prescribed lorazepam and amoxicillin" for a urinary tract infection. *Id.*

Ms. Gibbons' urinary tract infection persisted through May 20, 2016, and she once more sought treatment in the ER. *Gibbons*, 2025 WL 4481312, at *2. While there, she complained of "vertigo, nausea, vomiting, and whole-body numbness," and "was admitted for further testing." *Id.* "Her motor and strength exams were normal[,] . . . [h]owever, her deep tendon reflexes were diminished at all sites." *Id.* Further, "[s]he could not track any movement with her eyes because her eyes were fixed." *Id.* Dr. Howard Noack, a neurologist, "evaluated Ms. Gibbons on May 22, 2016." *Id.* Although "Ms. Gibbons could not move her right eye and had moderate movement in her left eye[, h]er strength, sensation, and deep tendon reflexes were normal." *Id.* "Dr. Noack did not 'know what to make of diffuse tingling and numbness[.]'" *Id.* He considered whether she was suffering from GBS-MFV but noted that Ms. Gibbons had "normal deep tendon reflexes." *Id.* He therefore referred her case to an ophthalmologist, who "stated that Ms. Gibbons did not have any meaningful eye movement." *Id.* While "[i]n the hospital, Ms. Gibbons[] again experienced urinary retention and a catheter was placed." *Id.* at *3. Her "May 25, 2016[,] discharge report included urinary retention as a problem." *Id.* Ms. Gibbons later testified "that during the May 2016 hospitalization, she had tingling in her 'face, legs, and toes, and cramping in her mid-back.'" *Id.*

On June 7, 2016, Ms. Gibbons saw Dr. Kenneth Kubis, a neuro-ophthalmologist. *Gibbons*, 2025 WL 4481312, at *3. She complained of "continued dizziness and difficulty focusing near and far." *Id.* "Dr. Kubis observed eye weakness and mild ptosis,"[3] and "suspected that Ms. Gibbons might have the Miller Fisher variant." *Id.* He therefore "ordered a test for the GQ1b antibody." *Id.* One week later, Ms. Gibbons saw Dr. Vidya Hawkins, a neurologist. *Id.* She complained of double vision and difficulty with walking. *Id.* Like Dr. Kubis, Dr. Hawkins suspected that Ms. Gibbons could have "atypical MFS." *Id.* She therefore "recommended a three-day trial of IVIG." *Id.* Ms. Gibbons tested positive for GQ1b antibodies. *Id.*

On June 22, 2016, Ms. Gibbons saw another doctor for increased blood pressure. *Gibbons*, 2025 WL 4481312, at *3. According to the notes taken by that doctor, the "working diagnosis [was] Miller Fisher variant." *Id.* (internal quotation marks omitted). On June 27, 2016, Ms. Gibbons began "[a] three-day course of IVIG." *Id.* At her follow up appointment with Dr. Hawkins, Ms. Gibbons reported "that the IVIG treatments had helped . . . [and] that she felt 95% back to normal with improvements in her double vision and balance." *Id.* She also reported, however, "that her problems worsened in the heat." *Id.* "Dr. Hawkins diagnosed Ms. Gibbons as suffering from GBS-MFV" but "did not order any further neurologic treatment," and "recommended that Ms. Gibbons see a urologist for her urinary symptoms." *Id.* Ms. Gibbons later testified that she saw Dr. Hawkins for "double vision and difficulty balancing." *Id.* at *4. She also testified "that her eyes fatigued easily, [that] she was experiencing general fatigue" and "that she was not having leg cramps and/or toe cramps." *Id.*

Ms. Gibbons returned to Dr. Kubis on August 9, 2016. *Gibbons*, 2025 WL 4481312, at *4. This time, "[s]he stated that her double vision and ptosis had resolved in July." *Id.* Additionally, "[s]he reported that she felt 'much better and near normal unless [she got] overheated[, in which case, she had] to sit down." *Id.* "Dr. Kubis examined her and found that her eye weakness and ptosis [were] 'now resolved,'" and "recommended neurology follow ups as needed." *Id.* Ms. Gibbons later testified "that around this time, she was experiencing episodes of double vision that lasted longer than one minute, once or twice per week." *Id.*

On August 29, 2016, Ms. Gibbons saw Dr. Michelle Koski, a urologist. *Gibbons*, 2025 WL 4481312, at *4. "She described her history of urinary retention and frequency, including occasional accidents." *Id.* Dr. Koski examined her, found "evidence of urethral prolapse,"[4] and "prescribed estrogen." *Id.* According to Dr. Koski, "Ms. Gibbons denied fatigue." *Id.* Ms. Gibbons later testified "that the medical record was accurate to her knowledge," but that she "did not recall being asked about fatigue and . . . would not [have told] a urogynecologist about fatigue." *Id.*

At some point in 2016, Ms. Gibbons emailed Dr. Kubis, complaining of "blurry vision in her right eye." *Gibbons*, 2025 WL 4481312, at *4. "She asked if blurry vision could be related to GBS-MFV," and Dr. Kubis "stated that it 'shouldn't be,' and recommended that she see an

---

[3] "'Ptosis' is a medical term for drooping eyelids." *Gibbons*, 2025 WL 4481312, at *3.

[4] "A urethral prolapse, also known as urethrocele, is 'prolapse of the urethral mucosa' and is 'a diverticulum of the urethral walls encroaching upon the vaginal canal.'" *Gibbons*, 2025 WL 4481312, at *3.

optometrist." *Id.* Ms. Gibbons later testified "that she [had] a regular eye doctor at Redhawk Vision." *Id.*

On January 16, 2017, Ms. Gibbons emailed Dr. Hawkins. *Gibbons*, 2025 WL 4481312, at *5. She complained of "increased urinary retention, tingling in her gums and jaw, and [said] she was concerned she may be having a relapse of GBS." *Id.* The next day, in a conversation with a nurse from Dr. Hawkins's office, "Ms. Gibbons clarified that her tingling sensation lasted only half of a day and resolved, [and that] she had no vision problems, but she did report a recent increase in stress." *Id.*

Ms. Gibbons had a CT scan on January 22, 2017, which "revealed that a large mass was displacing [her] uterus and bladder." *Gibbons*, 2025 WL 4481312, at *5. During her "preoperative evaluation, Ms. Gibbons reported 'continued mild fatigue with no current paresthesias or neurologic sequelae.'" *Id.* Ms. Gibbons had surgery on February 16, 2017. *Id.* At that point, "[t]he mass was identified as a 'large left ovarian cyst . . . that completely filled the pelvis.'" *Id.* "The surgeons removed both of Ms. Gibbons's ovaries and her left fallopian tube." *Id.* On February 17, 2017, "Ms. Gibbons emailed her surgeon to ask about estrogen patches and progesterone," and her "surgeon stated that she could start those medications right away." *Id.* The surgeon also stated that adjustments could be made at a later time "to make 'sure you do not have strong hot flashes.'" *Id.*

On March 13, 2017, Ms. Gibbons saw Dr. Meredith McMullen, her gynecologist. *Gibbons*, 2025 WL 4481312, at *5. She told her "that she was taking Climara as a form of [hormone replacement therapy ('HRT')]" and "did not report any symptoms of menopause." *Id.* "Dr. McMullen recommended that Ms. Gibbons continue her HRT." *Id.* Ms. Gibbons later testified "that after the operation, she could have been experiencing fatigue" and "was limited in her activities." *Id.* On March 22, 2017, she told "Dr. McMullen that she was menstruating . . . and asked whether this was normal." *Id.* Dr. McMullen told her that "bleeding can occur" when an individual starts HRT, but that "[a]fter the hormone levels stabilize, the bleeding will stop." *Id.* Ms. Gibbons refilled her Climara on July 3, 2017, and she refilled her progesterone on May 21, 2018. *Id.*

Ms. Gibbons emailed Dr. Hawkins on May 4, 2017, and reported heat intolerance, stating that she 'walked around at a street festival last week where it was 75 degrees and almost passed out[.]'" *Gibbons*, 2025 WL 4481312, at *5. She also stated that "she was 'sure [it was] related to [her] nerves' and her GBS-MFV." *Id.* Dr. Hawkins told her that she "should avoid environments with excess heat." *Id.* Ms. Gibbons later testified "that she did not tell Dr. Hawkins about her hormone replacement therapy," but "expected that Dr. Hawkins would know about the hormone replace therapy because it was documented in her medical records." *Id.* at *6. In addition, Ms. Gibbons "stated that heat intolerance has a 'gradual onset.'" *Id.* In her view, heat intolerance is characterized by a "shortness of breath, nausea, and a sense that she needs to sit down before she falls down," whereas "a hot flash brings about sudden heat and sweating without lasting fatigue." *Id.* Her recollection of being at the street festival was that she "experienced dizziness in the context of almost passing out," and "was also fatigued." *Id.*

In June 2017, Ms. Gibbons traveled from California to North Carolina to visit her parents." *Gibbons*, 2025 WL 4481312, at *6. Thereafter, "[o]n September 7, 2017, Ms. Gibbons sought care from a mental health provider for anxiety and possible depression." *Id.* She reported "low energy, sleep problems, [] a history of depression," and "trouble staying asleep," and wondered if the cause was hormonal. *Id.* "When reporting her current medications, she only noted Ativan, and when asked if she took any over the counter medications, her response was 'you name it . . . [.]'" *Id.*

Ms. Gibbons saw Dr. Hawkins on September 12, 2017, and "reported trouble with sleep, daytime fatigue, anxiety, intermittent tingling in her perioral region, and an increased need for 'screening breaks since GBS.'" *Gibbons*, 2025 WL 4481312, at *6. Dr. Hawkins found "no objective neurological deficits," upon examination and "prescribed a trial of nortriptyline for paresthesia."[5] *Id.* Also, "he explained that a '[c]oexisting mood disorder likely influence[d] her symptoms.'" *Id.* (first alteration in original). Ms. Gibbons later testified "that she had begun experiencing tingling in her perioral region in May 2016" and that "[w]hen she talked to Dr. Hawkins in September 2017, [she] was experiencing the tingling several times per day with episodes ranging from a few minutes to a few hours." *Id.* In her view, "[t]he tingling in her perioral region [prompted her] to take breaks from using screens because she was worried that she was having a relapse of GBS." *Id.* In addition, she explained her reported "daytime fatigue," as "whole body fatigue after basic daily activities, such as going to the grocery store." *Id.* Ms. Gibbons further testified that the "[t]his fatigue started in May 2016," that she did not have "leg cramps and/or toe cramps" and that she "did not recall having dizziness." *Id.*

On October 4, 2017, Ms. Gibbons saw her therapist. *Gibbons*, 2025 WL 4481312, at *7. At that visit, she "reported concerns with fatigue and sleep issues." *Id.* She also told her therapist that she had been written "a recent prescription for nortriptyline, but she did not fill that prescription." *Id.* She told her therapist she was taking "melatonin and Ativan" and stated "that she did not list her HRT because these medications were irrelevant to an appointment for mental health concerns." *Id.* Ms. Gibbons later testified "that the fatigue was preventing her from doing 'many activities with [her] daughter and [her] family'" and that "[s]he was taking breaks during the day." *Id.* She further "stated that for hormone replace therapy, she was using 'Climara estrogen patches, P[r]ometrium progesterone, and Estrace vaginal cream.'" *Id.*

Ms. Gibbons was seen for a weight management program on October 16, 2017, and she reported that she exercised three days a week at a moderate or strenuous level." *Gibbons*, 2025 WL 4481312, at *7. She later testified that she "had recorded information about her exercises in a notebook, [but] she no longer possesse[d] it." *Id.*

"On February 24, 2018, Ms. Gibbons called Dr. McMullen to discuss hormone concerns," noting that "[s]he had been lifting weights for four months, [but] her body had not changed." *Gibbons*, 2025 WL 4481312, at *7. Three months later, she saw another "provider associated with her PCP for unrelated concerns." *Id.* Ms. Gibbons told this provider "that she uses Climara once a week, but that she ran out and [was] getting more." *Id.* She further stated that "[s]he only uses Estrace as needed and the record states that she was not taking

---

[5] "Nortriptyline is an anti-depressive medication that is also used to relieve chronic, severe pain." *Gibbons*, 2025 WL 4481312, at *6.

progesterone." *Id.* Ms. Gibbons "explained that she was currently using a cream . . . and [that] she was considering restarting progesterone." *Id.* "When asked about this cream, Ms. Gibbons stated that she was using progesterone cream as that form was better for her than progesterone pills." *Id.*

"On July 19, 2018, Ms. Gibbons" again saw Dr. McMullen, who documented that she was using "[an] estradiol patch 0.05 mg/24h, applied once weekly, [oral] micronized progesterone 200 mg/d and estradiol vaginal cream." *Gibbons*, 2025 WL 4481312, at *7. During this visit, "Ms. Gibbons complained of low libido and requested testosterone." *Id.* Following an examination, Dr. McMullen noted that Ms. Gibbon's vagina was "normal appearing, suggesting an estrogen effect in the vagina." *Id.* "Dr. McMullen [also] documented that they reviewed hormone replacement therapy [] in detail" and Ms. Gibbons indicated that she "wanted to switch to oral meds." *Id.* Dr. McMullen continued "[h]er other HRT medications, including estrogen patch[es], oral micronized progesterone and vaginal estrogen cream." *Id.*

"On March 25, 2019, Ms. Gibbons saw [Dr.] Cynthia Sorrell [] for complaints of bilateral cramping in her legs and toes that began a few days earlier and reoccur[ed] upon exertion." *Gibbons*, 2025 WL 4481312, at *8. At that point, "[s]he was working out on an elliptical for 20 minutes a day, and during the last few days she [had] experienced cramping in the backs of her legs and toes." *Id.* Ms. Gibbons told Dr. Sorrell "that she [had] experienced muscle cramping and an electrolyte disturbance when she was diagnosed with GBS." *Id.* They reviewed the medications she was taking and "Ms. Gibbons explained that she stopped taking oral prometrium due to her belief that it caused irregular bleeding, but [stated that] she was using a Climara patch." *Id.* Dr. Sorrell noted "abnormal vaginal bleeding, and bilateral leg cramping." *Id.* She ordered lab tests "to check Ms. Gibbons's electrolytes and . . . urged [her] to talk with her gynecologist about changes to her HRT." *Id.* Ms. Gibbons later testified "that these leg and toe cramps 'started intermittently in 2017.'" *Id.* In retrospect, Ms. Gibbons "rated them as 7 or 8 in severity with 10 being a maximum. She also stated that one month after this report, she 'probably' still had leg and toe cramps[, although] she [did] not remember any specific incidents." *Id.* In addition, "Ms. Gibbons also connect[ed] this March 25, 2019[,] leg cramping to her earlier neurologic disorder." *Id.*

"Also on March 25, 2019, [Ms. Gibbons] emailed Dr. Hawkins and reported issues with a headache, cramping, and nausea, and feeling dehydrated." *Gibbons*, 2025 WL 4481312, at *8. Ms. Gibbons "stated that when she had GBS-MFV, she 'had trouble with [her] sodium potassium balance' and [indicated] that 'this [felt] like the same thing.'" *Id.* (first alteration in original). Dr. Hawkins recommended that she "try taking over-the-counter magnesium, and if that [did] not work, she could take muscle relaxers." *Id.* Ms. Gibbons later testified that "she [did] not recall whether she was experiencing tingling in her perioral region, fatigue, or dizziness" at the time. *Id.* The next day, "Ms. Gibbons emailed Dr. Sorrell and expressed concern that her labs showed low electrolytes[.]" *Id.* "Ms. Gibbons was told that while she had a borderline low chlorine, she should not be concerned unless she [was] experiencing active diarrhea[.]" *Id.* She was also told that "her results were otherwise normal." *Id.* "Her PCP reviewed the same labs and agreed that they were normal and suggested that Ms. Gibbons take a potassium tablet for one week to help with her cramping." *Id.* Two days later, Ms. Gibbons again saw Dr. Hawkins. *Id.* This time, she reported suffering from "leg cramping that was waking her at night." *Id.* Dr. Hawkins "noted that

6

she [did] not drink much water and that her electrolyte panel was normal." *Id.* Dr. Hawkins also "stated that a history of GBS may pre-dispose a person to cramping, and [] recommended increased hydration and magnesium supplements." *Id.*

"On April 30, 2019, Ms. Gibbons saw Dr. McMullen." *Gibbons*, 2025 WL 4481312, at *9. Dr. McMullen "noted that [Ms. Gibbons] was previously prescribed both progesterone and Climara, [] that 'she does not consistently use the progesterone,' [that] '[s]ometimes she does not use the estrogen consistently either,' and [that] she 'occasionally uses over-the-counter progesterone lotion.'" *Id.* (fourth alteration in original). "Dr. McMullen [also] noted that Ms. Gibbons was not taking any medications at the time of this appointment." *Id.* She told Ms. Gibbons that she "should take HRT as prescribed, including simultaneous use of progesterone and Climara." *Id.* In addition, Dr. McMullen "changed Ms. Gibbons's progesterone to Prometrium 100mg, and recommend[ed] she also continue the Climara patch." *Id.* "She [also] cautioned Ms. Gibbons that if she did not take her medication as directed, she could experience spotting." *Id.*

"On August 7, 2020, . . . Ms. Gibbons emailed Dr. Hawkins and stated that she was having more severe foot and leg cramps, and she was still taking magnesium and drinking mineral water." *Gibbons*, 2025 WL 4481312, at *9. Ms. Gibbons "asked what other prescription drugs were recommended and she [also] asked for a mental health counselor in Escondido." *Id.* "Baclofen was recommended."[6] *Id.* Ms. Gibbons later testified that this was the "second time that a medical record documents a complaint about leg cramps with the first instance being a March 25, 2019[,] instance." *Id.* "Ms. Gibbons saw or spoke to her PCP twice more in 2020 and reported no relevant issues." *Id.* "In March 2021, Ms. Gibbons emailed Dr. Hawkins about the COVID vaccines and saw an allergist about the same concerns." *Id.* She "did not report any GBS-MFV complaints" at that time. *Id.* "In August 2021, Ms. Gibbons asked her PCP for a letter supporting her need to cancel a gym membership" and "[i]n January 2022, Ms. Gibbons sought care for an unrelated issue." *Id.*

On April 11, 2018, Ms. Gibbons sought compensation under the Vaccine Act. Pet. for Vaccine Compensation [ECF 1]. She alleged that she contracted GBS-MFV from a Tdap vaccine. *Id.* ¶¶ 2-6. The SM found that Ms. Gibbons failed to demonstrate that her GBS-MFV lasted for more than six months and thus failed to satisfy the Vaccine Act's severity requirement. *Gibbons*, 2025 WL 4481312, at *1. Therefore, on December 10, 2025, the SM denied Ms. Gibbons's request for compensation. *Id.* at *22. Ms. Gibbons appealed his decision on February 10, 2026. Mem. of Objections [ECF 172]. The government responded on March 12, 2026. Resp't's Mem. in Resp. to Pet'r's Mot. for Review [ECF 174]. The petition is fully briefed, and the Court held oral argument on June 25, 2026.

## II.    STANDARD OF REVIEW

The United States Court of Federal Claims has jurisdiction under the Vaccine Act to review a special master's decision. 42 U.S.C. § 300aa-12(e)(2). In conducting its review, the Court may:

---

[6] "Baclofen is a medication to relax muscles." *Gibbons*, 2025 WL 4481312, at *9.

> (A)    uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B)    set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C)    remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2)(A)-(C).

The Court reviews a special master's findings of fact under the "arbitrary and capricious" standard, legal questions under the "not in accordance with law" standard, and discretionary rulings under the "abuse of discretion" standard. *Turner v. Sec'y of Health & Hum. Servs.*, 268 F.3d 1334, 1337 (Fed. Cir. 2001) (citing 42 U.S.C. § 300aa–12(e)(2)(B); *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870, 870 n.10 (Fed. Cir. 1992)). With respect to the arbitrary and capricious standard, "no uniform definition . . . has emerged," but it is "a highly deferential standard of review" such that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1527-28 (Fed. Cir. 1991); *accord Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that a decision is arbitrary and capricious if it is "so implausible that it could not be ascribed to a difference in view"); *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) ("We do not sit to reweigh the evidence. [If] the Special Master's conclusion [is] based on evidence in the record that [is] not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." (internal quotation marks and citation omitted) (alterations in *Cedillo*)). The "not in accordance with law" standard, on the other hand, is applied without deference to legal determinations. *Deribeaux v. Sec'y of Health & Hum. Servs.*, 717 F.3d 1363, 1366 (Fed. Cir. 2013); *see Munn*, 970 F.2d at 870 (stating that "[i]ssues of law—constitutional imperatives, statutory construction, procedural requirements—come to [the court] for decision with little if any deference owed to or expected by the forums below"). Lastly, the abuse of discretion standard applies to the special master's evidentiary rulings, such as determinations regarding the qualification of experts and the admissibility of their testimony. *Piscopo v. Sec'y of Health & Hum. Servs.*, 66 Fed. Cl. 49, 53 (2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The [abuse of discretion standard] will rarely come into play except where the special master excludes evidence." *Munn*, 970 F.2d at 870 n.10; *accord Caves v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 119, 131 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012).

## III.    LEGAL STANDARDS

"Under the Vaccine Act, Congress established a Vaccine Injury Compensation Program through which claimants could petition to receive compensation for vaccine-related injuries." *Markovich*, 477 F.3d at 1356 (citing 42 U.S.C. § 300aa-10(a)). As a threshold matter, a petitioner

must prove, by a preponderance of the evidence,[7] that she satisfies five elements in order to establish a prime facie case. *See* 42 U.S.C. § 300aa-11(c)(1)(A)-(E); *see also Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1150 (Fed. Cir. 2007) (stating that a petitioner has the burden of establishing the elements of 42 U.S.C. § 300aa-11(c)(1)). Two of these five elements are causation and severity. *See id.* § 300aa-11(c)(1)(C), (D). There are two ways for a petitioner to establish causation under the Vaccine Act. *Munn*, 970 F.2d at 865. First, a petitioner may demonstrate causation through a statutorily prescribed presumption by showing that the alleged injury meets the criteria listed on the Vaccine Injury Table ("Table"). *See* 42 U.S.C. § 300aa-11(c)(1)(C)(i). The Table identifies the covered vaccines, the corresponding injuries, and the time period after vaccination in which the particular injuries must occur. *See* 42 C.F.R. § 100.3. "[I]f a petitioner can establish that she received a listed vaccine and experienced such symptoms or injuries within the specified timeframes, she has met her prima facie burden to prove that the vaccine caused her injuries." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008). Alternatively, if a petitioner suffered an injury listed on the Table but not within the specified time period or if a petitioner suffered an "off-Table injury," she must prove "causation in fact" by a preponderance of the evidence. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1341-42 (Fed. Cir. 2010) (citing *Moberly v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1342 (Fed. Cir. 2010); 42 U.S.C. § 300aa-11(c)(1)(C)(ii)).

There are three ways for a petitioner to establish severity under the Vaccine Act. 42 U.S.C. § 300aa-11(c)(1)(D). To establish severity, a petitioner who suffers an injury from a vaccine must demonstrate that she "(i) suffered the residual effects or complications of such . . . injury[] or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such . . . injury[] or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention[.]" *Id.* With respect to the requirement that the petitioner suffer the residual effects or complications of the injury for more than six months after administration of the vaccine, the Federal Circuit has held that such requirement "is a condition precedent to filing a petition for compensation" and that it "is intended to restrict eligibility to the compensation program." *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011); *see also Wyatt v. Sec'y of Health & Hum. Servs.*, 144 Fed. Cl. 531, 539 (2019) (stating that a petitioner must "show by a preponderant evidence" that she meets the six-month severity requirement), *aff'd*, 825 F. App'x 880 (Fed. Cir. 2020). This requirement ensures that compensation under the Vaccine Act is made available only to those individuals who are seriously injured by a vaccine. *Cloer,* 654 F.3d at 1335. In evaluating a petitioner's alleged residual effects, "it is axiomatic that if there is no connection between [the injury] and [the alleged residual effects], there [are] no 'residual effects or complications' that lasted for more than six months," and the petitioner has not satisfied the severity requirement. *Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994). The special master or court may not find that a petitioner satisfies the

---

[7] "Compensation shall be awarded under the Program to a petitioner if the special master or court finds . . . that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa-11(c)(1) of this title." 42 U.S.C. § 300aa-13(a)(1)(A). "This court has interpreted the 'preponderance of the evidence' standard referred to in the Vaccine Act as one of proof by a simple preponderance, of 'more probable than not' causation." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1279 (Fed. Cir. 2005) (citing *Hellebrand v. Sec'y of Health & Hum. Servs.*, 999 F.2d 1565, 1572-73 (Fed. Cir. 1993)).

requirements based solely on the petitioner's claims, unsubstantiated by medical records or opinion. 42 U.S.C. § 300aa-13(a)(1).

Once the petitioner has established a prima facie case for entitlement to compensation, the burden shifts to the government to prove "[by] a preponderance of the evidence that the [petitioner's injury] is due to factors unrelated to the administration of the vaccine described in the petition." *de Bazan*, 539 F.3d at 1352 (quoting 42 U.S.C. § 300aa-13(a)(1)(B); *Walther*, 485 F.3d at 1150); *accord Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1357 (Fed. Cir. 2010) ("While the burden of proving a prima facie case is on the petitioner, the government has the burden of showing the injury or death was caused by a 'factor unrelated.'" (quoting 42 U.S.C. § 300aa-13(a)(1)(B) then citing *de Bazan,* 539 F.3d at 1352-54; *Walther,* 485 F.3d at 1150)).

## IV.    ANALYSIS

Ms. Gibbons challenges the SM's finding that her GBS-MFV did not satisfy the Vaccine Act's severity requirement and argues that she "continued to suffer residual effects from her GBS for years after her injury." [ECF 172] at 8.[8] In addition, she argues that she provided ample "proof of her ongoing residual symptoms [in the form of] . . . the expert report of a neurologist, and an endocrinologist, medical literature that report[ed] post GBS symptom[s], and [] the opinions of her treating doctors." *Id.* According to Ms. Gibbons, the SM "dismissed . . . the opinions of her treating doctors and her experts and disregarded the supporting medical literature," *id.*, with respect to three of her GBS-MFV symptoms—gum tingling, leg cramps, and heat sensitivity, *id.* at 9, 15, 19.[9] For the reasons stated below, the Court concludes that Ms. Gibbons has not shown that the SM's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### A.    Gum Tingling

Ms. Gibbons argues that, while the SM acknowledged that the gum tingling she experienced on May 15, 2016, was the beginning of her neurologic symptoms of GBS-MFV, he failed to recognize that the gum tingling she experienced in 2017 was also caused by the vaccine. [ECF 172] at 10. Further, she argues that the SM erroneously "blamed her 2017 gum tingling on an episode of tingling from 2014," *id.*, a conclusion she argues was "both factually wrong and legal error," *id.* at 11. According to Ms. Gibbons, whereas the gum tingling she experienced in 2016 was undoubtedly caused by GBS-MVF, "what caused the skin tingling in 2014 that was alleviated by hot bath" was unknown. *Id.* at 12. In addition, Ms. Gibbons contends that the SM inappropriately offered his own unsupported medical opinion when he discounted Dr. Steinman's conclusion "that the cause of [her] gum tingling in 2017 was 'that the cranial nerve that was attacked during the acute phase of the GBS had not yet fully healed,'" *id.* at 13, and

---

[8] All page numbers cited from the filings on the docket refer to the page numbers generated by the CM/ECF system.

[9] According to the SM, Ms. Gibbons identified "several problems" that allegedly were caused by her GBS-MFV. *Gibbons*, 2025 WL 4481312, at *13. They "include the following: tingling, fatigue, leg cramps, eye strain, heat sensitivity, and anxiety/depression." *Id.* In the instant petition for review, Ms. Gibbons only challenges the SM's conclusions as to three of her symptoms.

when the SM instead reasoned that "[i]f the nerve were not healed, then it seems more reasonable to expect that the damaged nerve would cause problems frequently and more consistently," *id.* at 14. Lastly, Ms. Gibbons challenges the SM's reliance on the testimony of Dr. Dara Jamieson, one of the government's expert witnesses, who opined that her January 2017 gum tingling was not proof that her GBS-MFV symptoms lasted more than three months. *Id.* at 14. In Ms. Gibbons's view, the SM's implication that her 2017 gum tingling "was in fact the same as her 2014 symptom . . . would constitute an attempt by [the government] at a factor unrelated defense[, . . . and it would therefore be the government's] burden to apportion between the two potential causes and prove that the GBS was not a cause." *Id.* at 14-15. The Court finds that the SM considered the relevant record evidence before him, drew plausible inferences, and articulated a rational basis for his decision.

Although Ms. Gibbons argues that the SM's conclusion regarding the cause of her gum tingling in 2017 was legally and factually wrong, what she is really arguing is that the SM should have credited the testimony of Dr. Steinman, her expert witness, over that of Dr. Jamieson, the government's expert witness. In fact, the SM considered both expert witnesses' testimony on the subject and explained why he reached the conclusions he did. *See Gibbons*, 2025 WL 4481312, at *13-*14. First, the SM explained why he found that "Dr. Steinman's opinion [was] based upon a selective and incomplete review of the medical records." *Id.* at *14. According to the SM, "Dr. Steinman relied exclusively upon the January 2017 email exchange between Ms. Gibbons and the office of her neurologist," in support of his opinion that Ms. Gibbons met the Vaccine Act's severity requirement. *Id.* at *13. This is significant to the SM because Dr. Steinman failed to account for a 2014 incident during which Ms. Gibbons experienced "tingling in the context of stress," which is similar to what she experienced in 2017 when she "reported tingling in her jaw, [and] she also reported stress." *Id.* at *14. In addition, the SM noted that Dr. Steinman failed to grapple with Ms. Gibbons's statement in January 2017 to her "neurologist's nurse that the 'tingling sensation only lasted [a] half day.'" *Id.* This is significant to the SM because, unlike Dr. Steinman, Dr. Jamieson directly addresses Ms. Gibbons's statement by concluding that "the 'report of hours of transient sensory complaints absolutely does not indicate a duration of MFS symptoms beyond 3 months.'" *Id.* Next, the SM explained why he was not persuaded by Dr. Steinman's opinion "that the 'most likely cause of the 2017 symptom is that the cranial nerve that was attacked during the acute phase of [Ms. Gibbons's] GBS had not yet fully healed.'" *Id.* According to the SM, Dr. Steinman failed to "persuasively explain[] why there appears to be only two episodes of tingling after August 2016, separated by approximately eight months." *Id.* The SM also noted that "Dr. Steinman's opinion that [Ms. Gibbons's] nerves had not completely healed is inconsistent with her report to Dr. Hawkins on June 16, 2016[,] that she was not having any numbness and tingling." *Id.*

Further, although Ms. Gibbons argues that it is the government's "burden to apportion between the two potential causes [of her gum tingling] and prove that the GBS was not a cause," [ECF 172] at 15, that burden only arises after a petitioner establishes a prima facie case by satisfying the elements in § 300aa-11(c)(1), *see Doe*, 601 F.3d at 1358 (finding that the burden never shifted to the government to establish an alternative cause because the petitioner failed to establish a prima facie case).[10] Here, the SM addressed Ms. Gibbons's gum tingling in the

---

[10] Once the petitioner has satisfied her burden under the causation element by providing "medical evidence relating to the possible role the vaccine had in causing her injury," *de Bazan*, 539 F.3d at 1353-54, the government must

11

context of whether she satisfied the Vaccine Act's severity requirement—one element of a prima facie case. *See Gibbons*, 2025 WL 4481312, at *13 ("Ms. Gibbons advances several problems that she alleges that the Miller-Fisher syndrome caused her to experience more than six months after onset. These include the following: tingling, fatigue, leg cramps, eye strain, heat sensitivity, and anxiety/depression."); *id.* at *14 ("For these reasons, the report of tingling does not satisfy Ms. Gibbons's burden to show her Miller Fisher syndrome lasted more than six months."). In this context, the government may present evidence of possible alternative causes of Ms. Gibbons's gum tingling to demonstrate the inadequacy of her prima facie case, and the SM may consider such evidence in evaluating whether Ms. Gibbons has established a prima facie case. *See Doe*, 601 F.3d at 1356-59 (considering the government's evidence when evaluating whether the petitioner established a prima facie case). The consideration of such evidence by the SM does "not improperly shift the burden to [Ms. Gibbons] to rule out alternative causes," *id.* at 1358. *See Walther*, 485 F.3d at 1151 ("[T]he government bears the burden of establishing alternative causation by a preponderance of the evidence once the petitioner has established a prima facie case."). Because Ms. Gibbons failed to establish a prima facie case, "the burden (and attendant restrictions on what 'factors unrelated' the government could argue) never shifted," *Doe*, 601 F.3d at 1358 (citations omitted). Therefore, the SM did not commit a legal error in this regard.

In sum, the Court cannot say that the SM's refusal to find that Ms. Gibbons's 2017 gum tingling was evidence that her GBS-MFV lasted for more than six months in light of the other evidence in the record is "so implausible that it could not be ascribed to a difference in view," *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. The SM reviewed all of the evidence related to tingling generally, explained why he was not persuaded by Dr. Steinman's opinion, and concluded that "the [January 2017] report of tingling does not satisfy Ms. Gibbons's burden to show her Miller Fisher syndrome lasted more than six months," *Gibbons*, 2025 WL 4481312, at *14. Because "[t]he special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories[, his] credibility findings are virtually unchallengeable on appeal." *Broekelschen*, 618 F.3d at 1347 (internal quotation marks and citations omitted); *accord Munn*, 970 F.2d at 871 (noting that the Federal Circuit does "not examine . . . the credibility of the [expert] witnesses" as this is for the special master in his role as fact finder).[11]

---

"prove[] by preponderant evidence that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)" of the petitioner's injury, *id.* at 1354 (emphasis omitted).

[11] Although the Court is troubled by the SM's unsupported statement that "[i]f [Ms. Gibbons's] nerve were not healed, then it [would] seem[] reasonable to expect that the damaged nerve would cause problems frequently and more consistently," *Gibbons*, 2025 WL 4481312, at *14, this does not affect the Court's conclusion regarding gum tingling. Ultimately, that the SM opined on what symptoms would result from a damaged nerve does not negate the Court's finding that the SM considered the record evidence regarding Ms. Gibbons's experience of tingling, plausibly inferred that the gum tingling she experienced in 2017 was more like what she experienced in 2014 than what she experienced shortly after receiving the Tdap vaccine, and explained why he was more persuaded by Dr. Jamieson's testimony than Dr. Steinman's. Stated differently, what might be characterized as dicta on the SM's part does not render his conclusion regarding this symptom arbitrary. *See Faup v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 445, 462 (2019) (concluding that where the special master's error was not outcome determinative, it was harmless) (collecting cases).

### B.    Leg Cramps

Ms. Gibbons argues that "[c]ramping is a known residual symptom of GBS," [ECF 172] at 15, and that "[i]t is undisputed that [she] suffered post GBS [leg] cramping," *id.* at 16, in 2019 and 2020, *id.* at 15. In her view, the SM erred when "he accepted [the government's] argument that cramping is common in the general population" and its "argument that [she] should not have cramping from her GBS because she did not suffer sensory nerve injury from her GBS." *Id.* at 16. According to Ms. Gibbons, "that the 'general population gets cramps' is not a viable defense as a matter of law and SM Moran's reliance on it is legal error," *id.* at 16, because the government failed "to eliminate the vaccine injury of GBS as a cause in Ms. Gibbons'[s] cramping," *id.* at 17, as it must under the relevant caselaw, *id.* at 16-17. In addition, she argues that the SM's conclusion that she "was not suffering from residual symptoms of her GBS injury," is not supported by the record. *Id.* at 18. In her view, not only is the SM's understanding of the relevant medical literature "wrong," but he "again [inappropriately] provides his [own unsupported] medical opinion." *Id.*

As an initial matter, the Court does not accept Ms. Gibbons's proposition that the government's "'general population gets cramps' [argument] is not a viable defense as a matter of law and SM Moran's reliance on it is legal error," [ECF 172] at 16. According to Ms. Gibbons, the government's "burden in sponsoring this, or any defense, is to also eliminate the vaccine injury as a cause." *Id.* While—as noted above—the Court agrees that this is indeed the case in the context of a dispute over causation after a petitioner establishes a prima facie case, the SM addressed Ms. Gibbons's leg cramps in the context of whether she satisfied the Vaccine Act's severity element—a required element of a prima facie case. *See Gibbons*, 2025 WL 4481312, at *13 ("Ms. Gibbons advances several problems that she alleges that the Miller-Fisher syndrome caused her to experience more than six months after onset. These include the following: tingling, fatigue, leg cramps, eye strain, heat sensitivity, and anxiety/depression."). Thus, the SM did not commit a legal error in this regard.

Furthermore, although Ms. Gibbons argues that the SM's conclusions—this time regarding the cause of her leg cramps—were factually wrong, what she is again really arguing is that the SM should have been more persuaded by her arguments, as opposed to the government's. In fact, the SM considered both parties' arguments regarding her leg cramps and provided a rational explanation as to why he reached his conclusions. *Gibbons*, 2025 WL 4481312, at *15-*16. Specifically, the SM addressed Ms. Gibbons's argument "that she suffered leg cramps as a sequela to GBS." *Id.* at *15. The SM noted that the medical article, "the Bernsen article," presented by Ms. Gibbons through Dr. Steinman, stood for the proposition "that roughly half the patients with GBS suffer residual leg cramps." *Id.* The SM further noted that Ms. Gibbons "complained about legs cramps in 2019 and 2020," and that in a March 28, 2018, report, "Dr. Hawkins wrote that [her] prior '[GBS] history may predispose her to be more likely to getting cramps.'" *Id.* Regarding the evidence on the other side, the SM acknowledged that the government argued, through an article cited by Dr. Jamieson, that "leg cramps are common in the general population, not just people with GBS." *Id.* Further, the SM noted that the Bernsen article "found that people with [GBS and] leg cramps *also* had sensory deficits detectable on examination." *Id.* (emphasis added). The SM then logically reasoned that because "Ms. Gibbons

was evaluated for sensory deficits and found not to have any," her symptoms were distinguishable from those of the individuals discussed in the Bernsen article. *Id.*

The SM also addressed the latency of Ms. Gibbons's leg cramps. *Gibbons*, 2025 WL 4481312, at *15. Here, the SM noted that although she "experienced the worst of the GBS in the summer of 2016," she apparently did not complain of leg cramps until 2019, which is "[t]he earliest time that [this] appear[s] in [her] medical records." *Id.* According to the SM, neither Ms. Gibbons nor her expert witness, Dr. Steinman, "persuasively explained how this sequence suggests that the GBS caused the leg cramping" when there was a three-year gap between the onset of her GBS and the documentation of her leg cramps. *Id.* The SM then considered the opinion of Dr. Hawkins, her treating physician, who "stated that a history of GBS 'may predispose' Ms. Gibbons to getting cramps." *Id.* Recognizing that the views of Ms. Gibbons's treating physician "merit[ed] careful consideration but [were] not dispositive," *id.*, the SM explained why he was not persuaded:

> On its face, the phrasing of Dr. Hawkins's statement introduces questions about its persuasiveness. . . . [A] doctor's statement that something "may" happen reflects indeterminacy. In other words, an expression that something "may" happen is similar to saying that something "may not" happen. Although in the Vaccine Program, petitioners are not required to establish their cases with scientific certainty, petitioners do bear a burden of proof to show that whatever they are proposing is more likely than not.

*id.* at *15-16. Thus, the SM reasonably interpreted Dr. Hawkins's statement to mean that, although her previous GBS may predispose her to getting cramps, it was not a foregone conclusion that the GBS was the cause of her cramps. The SM also noted that the significance of Dr. Hawkins's report was diminished by the fact that neither Dr. Steinman nor Ms. Gibbons could explain how it was that her GBS caused leg cramps three years later. *Id.* at *15.

Ms. Gibbons nevertheless contends that the SM's "reading of the Ber[n]sen article and his attempt at applying it to Ms. Gibbons [were] wrong," [ECF 172] at 18 (emphasis omitted). According to Ms. Gibbons, although "SM Moran claims that the Bernsen medical article [] proves that [she] should not suffer cramping from her GBS because she did not suffer from sensory deficits," the article "did not report or imply that all people must have these types of neurological deficits to have muscle cramps." *Id.* (emphasis omitted). Quoting from the report, Ms. Gibbons contends that "[m]any patients still complained of muscle ache and cramp 3 to 6 years after GBS . . . suggest[ing] that these complaints are related to residual sensory changes rather than to residual motor dysfunction." *Id.* (internal quotation marks omitted). Ms. Gibbons argues that "an objective reading of the Ber[n]sen article supports [her] claims of GBS caused cramping." *Id.* (emphasis omitted). Here, the Court cannot say that the SM failed to draw plausible inferences from the article or failed to articulate a rational basis for his distinguishing Ms. Gibbons's case from those of the Bernsen patients. The SM did not, as Ms. Gibbons contends, conclude that the Bernsen article "proves" that her GBS did not cause leg cramps because she did not also suffer sensory deficits. Rather, the SM found, based on several factors, that Ms. Gibbons's "leg cramps [*were*] *not likely* to be a sequela to GBS." *Gibbons*, 2025 WL

14

4481312, at *16 (emphasis added). Only one of those factors was "the frequency in which leg cramps afflict people without GBS." *Id.*

Moreover, the SM distinguished Ms. Gibbons's case from those of the Bernsen patients by noting that on four occasions when "Ms. Gibbons was evaluated for sensory deficits [she was] found not to have any." *Gibbons*, 2025 WL 4481312, at *15 (citing Ms. Gibbons's medical records from May 22, 2016; June 15, 2016; Aug. 2, 2016; and Sept. 12, 2017). Although Ms. Gibbons contends that she did in fact suffer from sensory deficits in May of 2016 and in September of 2017, the record evidence she references, which is the same evidence cited by the SM, reflects her own accounting of her symptoms rather than an objective examination of her symptoms by a medical professional. *See* [ECF 9-1] at 306 (Dr. Noack's notes from Ms. Gibbons's 5/22/2016 appointment state: "On 5-15 she states she developed tingling and numbness through out her whole body including her scalp, gums, hands and feet."); *id.* at 307 (Dr. Noack's notes from Ms. Gibbons's 5/22/2016 appointment state: "Thought of Miller-Fisher but she has normal deep tendon reflexes."); [ECF 23-3] at 20 (Dr. Hawkins's notes from Ms. Gibbons's 9/12/2017 appointment state: "Reports intermittent tingling in her perioral region[.] Sometimes bothersome[.]"); *id.* at 21 (Dr. Hawkins's notes from Ms. Gibbons's 9/12/2017 appointment state: "Denies weakness or sensory deficits in limbs[.]"). In any event, even if the Court were to disagree with the SM's assessment of the evidence, it is not this Court's role to reevaluate the evidence, so long as the SM's conclusion is rational, which the Court finds it is in this regard.[12] *See Cedillo*, 617 F.3d at 1338 (stating that the Court's role is not to reweigh the evidence if the Special Master's conclusion is based on the evidence and is not "wholly implausible").

In sum, the SM's finding with respect to Ms. Gibbons's leg cramps is not "so implausible that it could not be ascribed to a difference in view," *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Rather, the SM's conclusion that "the ambiguousness in Dr. Hawkins's statement, the long latency between when Ms. Gibbons experienced GBS and when she reported leg cramps, the lack of explanation from Dr. Steinman for why the latency was several years, and the frequency in which leg cramps afflict people without GBS . . . make the leg cramps not likely to be a sequela to GBS," was reasonable in light of the record evidence. *Gibbons*, 2025 WL 4481312, at *16.

---

[12] Ms. Gibbons once more argues that the SM offers his own unsupported medical opinion when he states "that complaints of cramping from 2019 should not be attributed to her GBS because of the passage of three years." [ECF 172] at 18. According to Ms. Gibbons, "[t]he reason that SM Moran cites no supporting medical opinion is because there is none," and further, her "treating neurologist[, Dr. Hawkins,] had no problem attributing her cramping to her GBS." *Id.* at 18-19. In fact, Dr. Hawkins, did not definitively attribute her cramping to GBS. Rather, in her notes from Ms. Gibbons's March 28, 2019 appointment, Dr. Hawkins stated that a "[p]rior [GBS] history *may* predispose her to be more likely to getting cramps." [ECF 61-1] at 67. Only after considering "the ambiguousness in Dr. Hawkins's statement" along with the other evidence of leg cramping did the SM conclude that Ms. Gibbons's leg cramping was not likely due to her GBS. *Gibbons*, 2025 WL 4481312, at *16. The SM did not, therefore, offer an unsupported medical opinion; rather, he relied on the evidence before him and came to a rational conclusion about the severity of the cramping experienced by Ms. Gibbons as a result of her GBS-MFV.

### C.    Heat Sensitivity

Ms. Gibbons argues that it is undisputed that "[h]eat intolerance is . . . [a] residual symptom of a GBS injury . . . [and that she] suffered from heat intolerance after her GBS injury and she continues to do so." [ECF 172] at 19. She further argues that despite these facts, the SM improperly accepted the government's argument that her "post GBS heat intolerance was caused by menopause." *Id.* According to Ms. Gibbons, the SM erred factually when he stated that her expert witness, Dr. Friday, attributed her heat sensitivity to perimenopause, when he in fact suggested "that there [were] multiple potential causes for [her] post GBS heat intolerance." *Id.* at 20. In addition, Ms. Gibbons contends that the SM erred factually by failing to note "that menopausal symptoms ease over time," *id.* at 22, and by failing to note that her medical records did not reflect that she suffered from hot flashes but instead reflected that she was healthy, thus refuting the government's argument that she should have been taking additional medications for her menopausal symptoms, *id.* at 21-22. Lastly, Ms. Gibbons avers that the SM erred legally by accepting the government's "argument that menopause can cause heat intolerance," *id.* at 22-23, without then also requiring the government to "rule out her GBS injury as a substantial factor in causing her symptoms," *id.* at 23.

The Court does not accept Ms. Gibbons's proposition that the SM erred legally by accepting the government's argument that menopause can cause heat sensitivity without then requiring the government to rule out GBS as a substantial factor in causing her heat sensitivity. As twice noted above, the burden of proof shifts to the government to establish alternative causation only after a petitioner establishes a prima facie case of causation. *See Walther*, 485 F.3d at 1151 (noting that the government bears the burden of proof only after the petitioner has established a prima facie case of causation). Here, because the SM considered Ms. Gibbons's proof in the context of the Vaccine Act's severity requirement, *see* 42 U.S.C. § 300aa-11(c)(1)(D), the burden never shifted, *see Doe*, 601 F.3d at 1358 (recognizing that the burden of proof and attendant restrictions on the type of evidence the government can present shifts to the government following the petitioner's establishment of a prima facie case of causation). Therefore, the SM did not commit a legal error when evaluating Ms. Gibbons's heat sensitivity.

Ms. Gibbons's most significant critique of the SM's findings regarding her heat sensitivity is that the SM should not have concluded, based on the evidence, that the cause was hormonal. With respect to Ms. Gibbons's claim that the SM mischaracterized Dr. Friday's testimony, *see* [ECF 172] at 20, the Court agrees.[13] Dr. Friday did not conclude that Ms. Gibbons's heat sensitivity in August of 2016 was unquestionably due to perimenopause or menopause. Thus, the SM's statements that "Dr. Friday has recognized that the August 2016 problems were due to perimenopause," *Gibbons*, 2025 WL 4481312, at *18, and that "Dr. Friday has acknowledged that the August 2016 episodes of heat intolerance were due to perimenopause," *id.*, are not accurate. However, these mischaracterizations are harmless error. *See Broekelschen*, 618 F.3d at 1350 (finding that "even if the special master's consideration of [the government's expert's] 'demeanor' was error, it would rise at most to the level of harmless

---

[13] Although Ms. Gibbons argues that the SM erred factually by failing to acknowledge that "her physical exam show[ed] that she was healthy . . . [and] that menopausal symptoms ease over time," [ECF 172] at 22, he is not under any obligation to do so as long as he "has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision," *Hines*, 940 F.2d at 1528.

error" (citation omitted)); *Hines*, 940 F.2d at 1526 (finding that although the special master erroneously took judicial notice of a particular fact, it was harmless error because the special master's decision was based on numerous other facts); *Stricker v. Sec'y of Health & Hum. Servs.*, 170 Fed. Cl. 701, 718 (2024) (finding that even if the special master's inclusion in the record of an article critical of an article submitted by the petitioner "was error, it was harmless error and [did] not provide a basis for finding the special master's rejection of [petitioner's article] to have been arbitrary and capricious"). The SM reasonably concluded that Ms. Gibbons did not persuasively show that her heat intolerance was related to her GBS-MFV in a manner that satisfies the severity requirement.

Regarding Ms. Gibbons's heat sensitivity in August 2016, the SM noted that "[t]he parties agree[d] that Ms. Gibbons first reported a symptom consistent with heat intolerance in August 2016." *Gibbons*, 2025 WL 4481312, at *17. The SM acknowledged that Ms. Gibbons reported heat sensitivity to Dr. Hawkins on August 2, 2016, and to Dr. Kubis on August 9, 2016. *Id.* According to the SM, because these dates were "less than six months after the onset of [her GBS-MFV] . . . , even if these reports of heat sensitivity were due to the Miller-Fisher variant, they would not, by themselves, establish that Ms. Gibbons me[t] the six-month requirement." *Id.* In addition, the SM stated that "reliable evidence supports a finding that Ms. Gibbons's perimenopause (and not her Miller-Fisher variant) caused her heat intolerance and hot flashes in August 2016." *Id.* The SM cited expert testimony from each party to support this statement. *See id.* (referencing testimony showing that Ms. Gibbons was "likely perimenopausal" in August 2016 and that hot flashes are associated with menopause); *accord id.* at 19 (referencing Dr. Friday's testimony that "menopausal associated symptoms of heat intolerance are possible") (internal quotation marks omitted).

The SM then analyzed Ms. Gibbons's reported heat sensitivity in the May 4, 2017, medical record to determine whether she satisfied the severity requirement. In this regard, the SM provided four reasons for concluding that the reported event was not "a sequela to the June 2016 episode of Miller-Fisher syndrome." *Gibbons*, 2025 WL 4481312, at *18. First, the SM noted "a latency between the two events," stating that "[t]here is not persuasive evidence to explain why, if the Miller Fisher syndrome were causing problems with heat, the problems would not become apparent until more than 10 months later." *Id.* In doing so, the SM stated that "[t]he problems with heat in August 2016 do not really help Ms. Gibbons because Dr. Friday has recognized that the August 2016 problems were due to perimenopause." *Id.* While this statement reflects a mischaracterization of Dr. Friday's testimony, such mischaracterization is harmless because the SM adequately supported his findings regarding the August 2016 timeframe in an earlier part of his decision. *See id.* at *17.

Second, the SM found that "Dr. Steinman's opinion that heat intolerance is due to Miller Fisher syndrome is not persuasive." *Gibbons*, 2025 WL 4481312, at *18. According to the SM, while acknowledging that Dr. Steinman attempts to link heat intolerance to a peripheral neuropathy, "Dr. Steinman's proposal of heat intolerance seem[ed] to be a belated afterthought." *Id.* In addition, the SM noted that although "Dr. Steinman reasoned that people with peripheral neuropathies can have dysautonomia and dysautonomia can include problems with heat," he stated that "Ms. Gibbons has not presented any persuasive evidence that she suffers from dysautonomia." *Id.*

17

Third, the SM stated that "the most important reason" he could not find that Ms. Gibbons's heat sensitivity in May of 2017 was due to her GBS-MFV was "that [the] evidence weighs in favor of finding that [her] problem with heat is more likely than not due to her abrupt menopause." *Gibbons*, 2025 WL 4481312, at *18. After incorrectly stating that Dr. Friday attributed Ms. Gibbons's experience of heat sensitivity in August of 2016 to perimenopause, the SM correctly noted that Dr. Friday was unable to rule out menopause as the cause of her heat sensitivity in May of 2017. *Id.* In addition, the SM noted that Dr. Friday also "mention[ed] that Dr. Hawkins did not connect [Ms. Gibbons's] near fainting at a street festival to menopause." *Id.* The SM reasoned that, despite the accuracy of Dr. Friday's observation, he could not infer that Dr. Hawkins believed that Ms. Gibbons's heat sensitivity was caused by her GBS. *Id.* (stating that "the inference that seems to be requested is not preponderantly established"). Further, because Dr. Hawkins, the physician who treated Ms. Gibbons for her GBS-MFV, was "basically silent about [the] causes for [her] heat problem," the SM considered the opinions of Ms. Gibbons's expert witnesses. *Id*. at *19. Here, the SM noted that although Dr. Friday accepted that "'menopausal associated symptoms of heat intolerance are possible,'" *id.*, he also stated that "Dr. Friday appears to require a relatively high level of proof as she wrote menopausal associated symptoms of heat intolerance 'are certainly not the only explanation' and Dr. Kubis's assessment 'certainly does not confirm a menopause causation,'" *id.* The SM therefore observed: "At a level of proof in which certainty is not required, Dr. Frankfurter's opinion that the May 2017 episode is from menopause is credited." *Id.*

Fourth, the SM explained that "[a]lthough Ms. Gibbons may have sincerely believed that her heat intolerance was neurologic, the neurologist who was treating her, Dr. Hawkins, did not endorse that belief," and "the neurologist whom Ms. Gibbons retained in the litigation, Dr. Steinman, seemed to come up with the idea that the heat intolerance was due to the Miller-Fisher variant as an afterthought." *Gibbons*, 2025 WL 4481312, at *19. The SM also noted that Ms. Gibbons did not possess the necessary qualifications, *i.e.*, a medical degree, to draw a causal connection between her GBS-MFV and her heat intolerance. *Id.*

In sum, the SM's decision shows that he considered the relevant record evidence, drew plausible inferences, and articulated a rational basis in reaching the conclusion that Ms. Gibbons failed to satisfy the Vaccine Act's severity requirement regarding her heat sensitivity. *See Williams v. Sec'y of Health & Hum. Servs.*, 178 Fed. Cl. 551, 556 (2025) (denying the petitioner's motion for review on the grounds that "the Special Master thoroughly evaluated the evidence of record and articulated a rational basis for finding that Petitioner did not meet her burden in meeting the six-month severity requirement").[14]

---

[14] Ms. Gibbons appears to challenge SM Moran's decision not to hold a hearing. *See* [ECF 172] at 7 ("SM Moran refused to allow a hearing where [she] could provide testimony."). However, the Court finds that the SM acted within his discretion in doing so. "Special masters have wide discretion in determining whether to conduct an evidentiary hearing" under the Vaccine Act and under the Vaccine Rules. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1365 (Fed. Cir. 2020) (citations omitted). Pursuant to 42 U.S.C. § 300aa-12(d)(3)(B)(v), a special master "may conduct such hearings as may be reasonable and necessary." Further, pursuant to Vaccine Rule 8(d), a "special master may decide a case on the basis of written submissions without conducting an evidentiary hearing." RCFC, App. B, Vaccine Rule 8(d). In the instant case, Ms. Gibbons concedes that she was able to "provide extensive affidavit testimony which was filed" on the record. [ECF 172] at 7. Further, although Ms. Gibbons argues that "[a]lmost none of [her] affidavit testimony was included in the decision," *id.*, there is no doubt that the SM considered her affidavit testimony as he referenced it on multiple occasions throughout his decision

## V.    CONCLUSION

In sum, Ms. Gibbons has not demonstrated that SM Moran's decision denying her petition for compensation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The SM rationally concluded that, while Ms. Gibbons may have suffered GBS-MFV following her Tdap vaccination, she failed to establish that "the adverse reaction [was] severe enough to last six months" and therefore failed to meet the Vaccine Act's severity element. *Gibbons*, 2025 WL 4481312, at *22. Therefore, her petition [ECF 172] is **DENIED**, and the SM's December 10, 2025, decision is **SUSTAINED**. The Clerk of the Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge

---

under the caption "Ms. Gibbons's statement about this medical record," *see, e.g.*, *Gibbons*, 2025 WL 4481312, at *4 (citing Ms. Gibbons's Sept. 23, 2024, Affidavit at ¶ 45); *id.* (same at ¶ 46); *id.* (same at ¶ 48). Therefore, the Court finds no reason to disturb this decision. *See Moyler v. United States*, 179 Fed. Cl. 126, 138 (2025) (noting that "[a]lthough an evidentiary hearing would have been a reasonable choice . . . the special master was within his discretion not to conduct an evidentiary hearing"). Additionally, the Court notes that the SM gave Ms. Gibbons "multiple opportunities to demonstrate that she met the severity requirement," such as allowing her to submit multiple affidavits, two expert reports from Dr. Steinman, a primary brief, a reply brief, and answers to a series of written questions posed by the SM. *Gibbons*, 2025 WL 4481312, at *21.

19